Filed 8/23/23  In re N.D. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re N.D. et al., Persons Coming Under the Juvenile Court Law. | B315570 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. Nos. 21CCJP02636A-C) |
| Plaintiff and Respondent, | |
| v. | |
| J.S. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant D.D.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother and father separately appeal the juvenile court's jurisdiction and disposition orders under Welfare and Institutions Code sections 300 and 361, subdivision (c).[1]  Both parents argue there was insufficient evidence to support the court's jurisdictional findings and orders removing their three children from parental custody.  Father also contends it was error for the court to find that the Los Angeles County Department of Children and Family Services (the Department) had complied with its obligations under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California statutes (Welf. & Inst. Code, § 224 et seq.).  We affirm, finding father's ICWA contention to be moot.

## BACKGROUND[2]

*Family history*

The current case involves mother, father, and their three children: a daughter (born June 2020) and twin infant boys (born

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] We "review the record in the light most favorable to the court's determinations."  (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

May 2021). Mother had previously given birth to four other children with different fathers. The oldest two were twins who were born in March 2009 and lived in Arizona with their paternal grandmother. Mother did not have contact with the paternal grandmother, but sometimes communicated with one of the twins through Snapchat. Mother's next child was born in Waco, Texas, in December 2010. In 2017, mother arranged for that child to live with the child's father and paternal grandparents in Tampa, Florida, because mother was pregnant and caring for a terminally ill grandparent. Mother's fourth child was born at 22 weeks gestation and died 12 hours later; after that, mother began to use methamphetamine and heroin. Mother reported that she was " 'homeless and messed up,' " and that she was trafficked and was a victim of sexual assault.

Mother met father in New York; she claimed that father helped her build a new life and that she stopped using drugs. At some point prior to June 2020, the parents moved to Los Angeles.

When mother gave birth to the couple's daughter in June 2020, a child welfare referral was generated because mother tested positive for marijuana and disclosed a history of psychiatric disorders, homelessness, tobacco and marijuana use during the pregnancy, and the loss of a prior pregnancy "due to cocaine use, polysubstance abuse prior to pregnancy (meth, heroin, cocaine)." (Emphasis omitted.) When a Department social worker interviewed mother, she was alert and oriented, although she was anxious and triggered by the social worker's questions. Mother acknowledged her history of mental illness, stating she took prescribed psychiatric medications for three months, but then discontinued medications without direction

from her doctor because she felt fine.  The matter was evaluated out.

In October 2020, the Department received a report of general neglect, alleging mother and father had been staying in multiple hotels since their daughter was born, that mother was prostituting, using heroin, and cutting to self-harm.  The parents were participating in a homeless shelter program at a hotel, and they refused to allow the social worker to enter to assess the child.  The matter was closed as inconclusive.

*Initial investigation and petition*

The Department received a new referral on May 13, 2021, when mother and father's twin sons were born prematurely, at 33 1/2 weeks of pregnancy, and mother tested positive for amphetamines and cannabinoids.  The toxicology results for one twin showed a presumptive positive for amphetamine and cannabinoids, while the other twin's results showed a presumptive positive for cannabinoids only.  Meconium tests were still pending.  The infants did not show signs of withdrawal, but were kept in the NICU due to their premature birth and to rule out sepsis.  They were scheduled to be released from the hospital in three weeks.  Mother denied using methamphetamine, but acknowledged using marijuana for anxiety and seizures.  According to the referring party, mother stated she lives in a drug house and had to clean methamphetamine off the walls.  Mother denied any history with the Department, and received minimal pre-natal care.

Mother was discharged from the hospital before the social worker could speak to her.  Mother had brief phone contact with

4

the social worker on May 19, 2021, and agreed to a drug test. Both mother and father tested positive for marijuana on May 19, 2021. Mother deferred meeting with the social worker several times, eventually speaking with the social worker by phone on May 28, 2021. When asked about the positive toxicology results from the hospital, mother explained that she and father had moved into a new home, and the prior owners had left boxes in the attic. Mother was feeling fine until she dropped one of the boxes, which contained paint and glass vases that broke when she dropped the box. Asked whether there was anything in the vases, mother responded, " 'they just broke.' " Right after dropping the box, she started feeling cramps and back pain and was turning pale and sweating. She was then rushed to the hospital, where she had a Cesarean section. She was not sure how amphetamines got into her baby's system. Mother also said she and father smoke "pre-rolled joints." Asked to explain what a "pre-rolled joint" was, mother said it was not really marijuana, and that she did not know she was pregnant until March 2021. Mother denied any domestic violence, mental health issues, or taking medication for mental health concerns. She denied any prior child welfare history. When the social worker reminded her of the Department's October 2020 investigation, mother said the allegations were not true and the social worker never asked her or father to drug test. Father did not respond to the social worker's attempts to contact him in May of 2021.

On June 2, 2021, the Department obtained an order to remove all three children from parental custody: the twins were to remain in the hospital until they were released to foster parents, and daughter was to be placed in the care of paternal great aunt. The Department's June 4, 2021, initial dependency

5

petition alleged three counts: Counts b-1 and b-2 identified each twin separately, alleging each twin's toxicology results. Count b-3 alleged all three children were at risk of harm based on mother's substance abuse and father's failure to protect.

*Jurisdiction/disposition report and amended petition*

Interviewed for the first time on June 7, 2021, father told a social worker that he had given mother over the counter Tylenol, and believed that the Tylenol may have caused the twins' premature birth. He said mother received prenatal care as soon as she learned she was pregnant, but he could not remember at what point in the pregnancy that happened, and he could not remember the name of the clinic. Father said mother used marijuana during her pregnancy because she could not take other medications.

On July 8, 2021, mother again admitted using marijuana during her pregnancy, but denied using methamphetamine. Mother asked how one twin could test positive for methamphetamine when the other did not. She also mentioned that the Tylenol father gave her might have had Sudafed in it, and that father was upset because he gave it to her. Mother repeated her belief that shortly before she went into labor, she might have inhaled something after dropping a box at her new apartment. According to the social worker's report, "Mother stated, 'It's a drug community. I was cleaning the cupboards and I dropped a box that had a bunch of glass in it. I didn't see any glass pipes or anything. I think I might have inhaled something.'" Mother admitted using methamphetamine and heroin after her son passed away in 2017. She explained she

6

started using when that son's father " 'gave it to me and said for me to do it because it would make me feel better. Once I started I was hooked. I had gone through severe trauma. I used until 2018 and then I quit cold turkey. I didn't go to rehab or use that medication they give you. After that I had a lot of anxiety.' "

Mother confirmed she was diagnosed in 2019 with Post-Traumatic Stress Disorder (PTSD) and Schizoaffective Disorder, and was hospitalized in Belton, Texas for nine days. She explained that " 'in late 2018, early 2019, I went through what they called meth induced psychosis. I was hallucinating. I was hearing and seeing things. That never happened to me in my life. I thought it was real, it was very intense.' " The hospital wanted her to go to an inpatient rehabilitation, but she did not go. She was prescribed several psychotropic medications, and went to therapy for two months. Her medication was stolen, she did not continue therapy or seek out any mental health services after that time. She told the social worker that she was experiencing depression before and after the twins' birth, and was open to services. Mother appeared motivated to participate in services and get her children back.

On July 9, 2021, the Department filed an amended petition, adding mother's substance abuse history to count b-3, and adding a new count (b-4), alleging all three children were at risk of harm based on mother's mental and emotional problems. Count b-4 did not contain any allegations against father.

In a second interview on July 9, 2021, father was upset with the Department for taking his children without giving him a chance first. He and mother met when they were both homeless in Buffalo, New York, and came to California less than a year later. He denied knowing mother's mental health history or her

7

history of using methamphetamine and heroin.  Father presented as aggressive during the interview, and gave very limited responses.

The social worker tried to obtain child welfare history involving mother from Arizona, Texas, and New York.  Someone from Arizona's Child Protection Hotline reported that mother had no open or closed cases in Arizona, but there had been an investigation in January 2019, based on a report that mother was unable to care for her children due to her heroin addiction.  A disposition was not available.

*Last minute information report*

A Last Minute Information report dated August 9, 2021, included medical records for both twins.  The report stated toxicology results confirmed each infant tested positive for methamphetamine and THC, and negative for amphetamine.  The description was accurate for one twin, but the other twin's medical records showed that the meconium drug screen came back positive for amphetamine and marijuana  In addition, the drug test results for one twin included language cautioning on relying on the report for anything other than medical use.[3]

---

[3] The lab report included the following cautionary language:  "This drug screen is for medical use only.  The results are presumptive, based on screening methods, and they have not been confirmed by a second independent chemical method."  The document continued:  "These results should be used only by physicians to render diagnosis or treatment, or to monitor progress of medical conditions.  These results should not be used for any legal purpose or for employment evaluation."

8

*Adjudication and disposition hearing*

At the adjudication hearing on August 9, 2021, the juvenile court admitted the infants' lab results over the parents' objection. After the court heard argument from all parties, it sustained all four counts of the amended petition, as amended by interlineation. The court's interlineation resulted in count b-3 alleging that father only failed to protect daughter from mother's substance abuse, not all three children, and b-4 alleging that mother's history of mental and emotional problems placed all three children at risk of harm.

At disposition, mother and father asked for the children to be returned to their custody. The court responded to mother's request by pointing to parents' lack of cooperation during the Department's October 2020 investigation, and mother's delay in signing up for services. Father pointed out that he was non-offending as to the twins, and asked for children to be placed with him, with mother moving out if the court was not willing to order the children returned to both parents. Father alternatively sought unmonitored visits. The Department argued for removal of all three children, with reunification services. The Department pointed out both parents had a history of being uncooperative and hiding from the Department, and argued that returning the children to father would jeopardize the children's safety in light of father's lack of understanding of the risks posed by mother. The court ordered all three children removed from parental custody, with visitation and reunification services in accordance with the case plan.

Mother and father filed separate notices of appeal.

**DISCUSSION**

*Justiciability and standing*

On appeal, mother only challenges the sufficiency of the evidence as to the counts based on substance abuse (counts b-1, b-2, and b-3). She does not challenge the sufficiency of the evidence supporting count b-4, that all three children are at risk of harm based on her untreated mental health problems. Although the juvenile court only sustained a single count against father, based on his failure to protect their daughter from harm based on mother's substance abuse (count b-3), his appellate briefing challenges the sufficiency of the evidence as to all four counts. Both parents contend the court erred in removing all three children from parental custody. The Department contends mother's appeal is non-justiciable, and father lacks standing to challenge the counts that do not involve him.

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) However, when the challenged jurisdictional findings serve as the basis for dispositional orders that are also challenged on appeal, we may exercise our discretion to review the merits of the challenge. (*In*

*re Drake M.* (2012) 211 Cal.App.4th 754, 762–763; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 454.)

Because both parents appeal the orders removing all three children from their custody, we exercise our discretion to consider whether there is sufficient evidence to support the jurisdictional finding of substance abuse (primarily count b-3).  However, we decline to consider father's challenge to the sufficiency of the evidence supporting count b-4 against mother.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

*Evidentiary support for jurisdiction and disposition orders*

A.  <u>Standard of Review and Applicable Law</u>

The California Legislature has declared that the purpose of our dependency statutes "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. . . . The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2, subd. (a).)

When the court amended and sustained count b-3, the language of former section 300, subdivision (b)(1), authorized dependency jurisdiction over a child where the "child has

11

suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's inability or failure "to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."[4] (Stats. 2015, ch. 303, § 566.)

Generally, a parent's substance abuse, "without more," is an insufficient basis to assert dependency jurisdiction. (*In re L.W.* (2019) 32 Cal.App.5th 840, 849.) The jurisdictional finding "cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) However, when the children at issue are very young, as they were here, " 'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.' [Citations.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219; see also *In re K.B.* (2021) 59 Cal.App.5th 593, 603.)

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citation.] The court may consider past events in deciding whether a child presently needs

---

[4] Later legislative amendments did not change the quoted language, but further divided subdivision (b)(1) of section 300, so that portions of the quoted language appear in section 300, subdivision (b)(1)(B) and (b)(1)(D).

the court's protection.  [Citation.]  A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' "  (*In re Christopher R., supra*, 225 Cal.App.4th at pp. 1215–1216.)

Section 361, subdivision (c)(1), provides a dependent child may only be removed from a parent if the dependency court finds "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  The court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)  " 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.'  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]"  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.)

Although a juvenile court may consider hearsay evidence at a jurisdictional hearing, "if a timely objection is made and no hearsay exception applies, the evidence must be corroborated."  (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1280.)  "Corroborating evidence is evidence which supports a logical and reasonable inference that the act described in the hearsay statement occurred.  [Citation.]  The quantum of corroboration necessary to support a jurisdictional finding is 'somewhat analogous to the

rule in criminal law requiring independent corroborative proof of accomplice testimony,' that is, direct or circumstantial evidence, even if slight, is sufficient if it tends to connect the accused with the act." (*Id.* at pp. 1280–1281.) "At the . . . dispositional phase, any relevant evidence including hearsay shall be admitted pursuant to section 358, subdivision (b) to help the court determine the child's best interests." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 347.)

We review the jurisdictional findings for substantial evidence, drawing all reasonable inferences in support of the juvenile court's decision and refraining from reweighing issues of fact or credibility. (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580.) Although the substantial evidence standard may be met by inferences, such inferences must be reasonable in light of the entire record, and not based on speculation or conjecture alone. (*In re J.A., supra*, 47 Cal.App.5th at p. 1046.) We review a juvenile court's removal order for substantial evidence as well, but we must find substantial evidence sufficient to support the juvenile court's finding to have been made by clear and convincing evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 149, 155.)

B. Jurisdiction

As amended and sustained by the court, count b-3 alleged mother "has a history of substance abuse including

14

methamphetamine, heroin, and marijuana.  Mother [] is a is a current abuser of amphetamine and marijuana, which renders [her] unable to provide regular care of the children.  The mother used amphetamine and marijuana during [her] pregnancy with the [twins], and [she] had a positive toxicology screen for amphetamine and marijuana at the birth of the children.  On 5/19/2021, the mother had a positive toxicology screening for marijuana.  The children are of such a young age as to require constant care and supervision and the mother's substance abuse interferes with providing regular care of the children.  The childrens' father . . . knew, or reasonably should have known of the mother's substance abuse and the father's failed to take action to protect [the older child].  The mother's substance abuse and the father's failure to protect the [older child], endanger the children's physical health and safety and place the children at risk of serious physical harm, damage, danger, and failure to protect."  (Emphasis omitted.)

Parents contend the twins' unconfirmed positive drug tests cannot support the jurisdictional finding because the test reports are hearsay evidence or are otherwise unreliable.  The newborn twins' initial drug tests returned positive for cannabinoids for both twins, and positive for amphetamines for one twin.  Subsequent meconium testing confirmed the positive amphetamine and cannabinoid test for one twin, and the positive cannabinoid test for the other twin.  At the time of the twins' birth, mother also tested positive for amphetamine and cannabinoids.  Both parents tested positive for cannabinoids a week later, on May 19, 2021.At the adjudication hearing in August 2021, father raised a hearsay objection to admission of the Department's Last Minute Information Report, specifically

15

the infants' drug test results.  Mother joined in the objection.  The court admitted the documents over the parents' objections.

The parents' objections to admission of the twins' toxicology results did not extend to the Department's other reports, which included mother's own positive drug test results, where she tested positive for amphetamine and cannabinoids on the day she gave birth to the twins, and positive for cannabinoids a week later.  Mother's own test results provide sufficient corroboration for the twin's positive test results, (*In re R.R., supra*, 187 Cal.App.4th at p. 1280), and there is substantial evidence of mother's drug use, from which risk to the newborns could be reasonably inferred.  Mother and father admitted to using marijuana, both during mother's pregnancy and afterwards.  In addition, mother reported that before she went into labor, she and father were living in a drug community, and that she may have inhaled something that caused her to go into labor prematurely.  With the evidence before it, the juvenile court was free to find mother's explanation (that her ingestion of amphetamine was unintended or accidental) to not be credible.  Considered together with the evidence of mother's past drug addiction and the parents' admitted marijuana use, the test results support a reasonable inference that mother exposed her unborn children to drugs.  It is not our role to reweigh the evidence considered by the trial court, or to make credibility determinations.

The parents argue on appeal that the Department's decision not to intervene when it learned mother used marijuana during her pregnancy with the older child supports a reasonable inference that the primary concern was mother's use or abuse of amphetamine.  However, this argument mischaracterizes the

16

applicable standard of review, which draws all reasonable inferences in favor of the jurisdictional finding.

The parents also argue that there was no evidence that the children suffered any harm as a result of their drug use. However, dependency jurisdiction applies not only to children who have suffered harm, but those who are at risk of harm, and a determination of substance abuse establishes a prima facie case that children of "tender years" are at risk of harm. (*In re Drake M., supra,* 211 Cal.App.4th at p. 767.) In addition, the parents' evasiveness during the Department's attempts to investigate the October 2020 referral provided further support for the juvenile court's conclusion that mother's substance abuse posed a substantial risk to the children. The referral alleged that mother was using heroin, both parents appeared to be under the influence of drugs and fought frequently. When a social worker attempted to investigate, father lied about mother's whereabouts, mother was aggressive and uncooperative, and both parents refused entry to the social worker to assess the child. (*See In re E.E.* (2020) 49 Cal.App.5th 195, 213–215 [citing mother's evasive behavior during agency's attempt to investigate dependency referral as support for juvenile court's conclusion that mother's substance abuse posed a risk to children].) During the Department's investigation into the current case, father could not recall when or where mother had received pre-natal care, and he claimed to be unaware of her past drug addiction and mental health problems, even though mother reported her history during the birth of their daughter in June 2020, triggering a Department investigation.

Considering all of these facts collectively, count b-3 of the petition is supported by substantial evidence.

C. <u>Removal Order</u>

Substantial evidence also supports the court's removal order, even considering the higher evidentiary standard applicable in the juvenile court. In addition to the evidence in support of the jurisdictional finding, as recited earlier in this opinion, we note that father was simply not available for even an interview until almost a month after the twins were born, his demeanor was aggressive, and he gave limited responses to questions. The parents' visits with their children after detention were also inconsistent and erratic. The older child's caregiver reported that parents sometimes cancelled visits due to reported illness, but also called incessantly, demanding visits on short notice at late night hours that were not aligned with an infant's schedule. Mother had inconsistent video chats with the infants, and father had never called the twins' caregiver. Keeping in mind that the goal of dependency proceedings is to ensure the childrens' safety, the court's decision to remove all three children from parental custody was well-substantiated.

*ICWA*

Father challenges the court's ICWA determination. Mother denied any Indian ancestry, but father filed a Parental Notification of Indian Status (ICWA-020) form indicating possible Indian ancestry through the Sioux of Mississippi or Cherokee of Oklahoma tribes. Responding to questions from the court, father denied knowing of any relatives that were members of the Sioux or Cherokee tribes, but the court ordered the Department to make additional inquiry efforts related to father's claim.

Paternal grandfather reported that, based upon their physical appearances, his maternal great-grandmother was possibly of Cherokee descent, and he believed his father (paternal great-grandfather) had Native American heritage. All of paternal grandfather's relatives were born in Arkansas, and he did not have their information. The Department sent ICWA-030 notices to the Secretary of the Interior, the Bureau of Indian Affairs, and three Cherokee tribes. The notices included the parents' information, and the names and dates of birth for paternal grandparents and paternal great-grandparents. By September 24, 2021, the Department had received responses from two of the three Cherokee tribes notified, and had left a voicemail for the third tribe. After father initiated the current appeal, the Department provided the juvenile court with reports that the third Cherokee tribe denied that the children were Indian children under ICWA, and father and additional paternal relatives, including paternal grandfather, denied any Indian ancestry. The court found ICWA inapplicable on February 27, 2023.

The Department filed a request for judicial notice of post-appeal filings and orders showing that ICWA requirements have been met, and asks us to dismiss father's ICWA challenge as moot. Father in his reply brief concedes that the post-appeal evidence renders his ICWA challenge moot. We grant the Department's request for judicial notice and find father's ICWA contentions to be moot.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.
NOT TO BE PUBLISHED.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.